**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

DANIEL MILLER,                *

                           *

           Plaintiff,      *

      v.                 *

                           *     Civil Action No. AW-09-3137

MONTGOMERY COUNTY,    *

MARYLAND., *et al.*,       *

                           *

          Defendants.    *

                        *****

## MEMORANDUM OPINION

Currently pending before the Court are County Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Doc. No. 17); MNCPPC, Rollin Stanley, and Mark Pfefferle's Motion to Dismiss or in the Alternative, Motion for Summary Judgment (Doc. No. 33); Defendants' Motions to Strike Plaintiff's First Amended Complaint (Doc. Nos. 40 and 41); and Plaintiff's Motion to Amend Complaint (Doc. No. 46-1). The Court has reviewed the entire record, as well as the pleadings with respect to the instant motions and has determined that no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2004).

The Court will **GRANT** the Plaintiff's Motion to Amend and will base this Memorandum Opinion on Plaintiff's First Amended Complaint. Consequently, this Court will consider Defendants' Motions to Dismiss as a response to Plaintiff's First Amended Complaint. The Court will **DENY-AS-MOOT** Defendants' Motions to Strike Plaintiff's First Amended Complaint. Additionally, the Court will **GRANT** County and Commission Defendants' Motions to Dismiss.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Daniel Miller brought the instant action against Defendants Montgomery County ("County Defendant") and the Maryland National Capital Park and Planning Commission ("Defendant MNCPPC") on November 23, 2009. Plaintiff filed several causes of action against County Defendant and MNCPPC, as well as against several employees of these Defendants. Plaintiff alleges that the Defendants have committed violations of 42 U.S.C. §1983 and the Maryland Constitution and Declaration of Rights, in addition to committing various common law torts.

Plaintiff Daniel Miller, a resident of Virginia, is the owner and operator of D.L. Miller Logging, a sole proprietorship with its principal place of business in Boyce, Virginia. Defendant Montgomery County (County Defendant) is a corporate body, chartered under the laws of Maryland. Defendant Laura Miller is an employee of Montgomery County, working in the position of "County Arborist." Miller works within Montgomery County's Division of Environmental Policy and Compliance ("Environmental Division"), which is a department within the County's Department of Environmental Protection ("DEP"). Defendant Stan Edwards is the Division Chief of the Environmental Division. Defendant Dan Hoyt is the Director of DEP, and he supervised Defendants Miller and Edward during the incidents which give rise to the case at bar. Hoyt was appointed and supervised by Defendant Isiah Leggett, a Montgomery County executive.

Defendant Maryland National Capital Park and Planning Commission ("Defendant MNCPPC"), is a corporate and political body created under the laws of Maryland. Defendant Rollin Stanley is the Director of Planning for Defendant MNCPPC and supervises Defendant Mark Pfefferle, who is the MNCPPC Forest Conversation Program Manager.

The conduct giving rise to this action will be briefly discussed. On June 27, 2008, Plaintiff Daniel Miller entered into a contract with Charles Mess ("Property Owner") in which Plaintiff would purchase approximately 584 trees from Dr. Mess' property. Plaintiff selected the 584 trees for harvesting, personally marking the trees of his choice. The agreement between Plaintiff and Mr. Mess was to conduct a "Timber Harvest Operation" on Mess' property. Under the contract between the two parties, Mess and Plaintiff agreed that Plaintiff would obtain the permits necessary to conduct the Timber Harvest Operation. Pursuant to §22A of the Montgomery County Code ("Forest Conservation Law"), Timber Harvest Operations are exempt from state restrictions under the Chapter 22 of the Montgomery County Code, the "Forest Conservation Law." MONTGOMERY, MD., CODE §22A-5. However, before one can begin the harvesting operation, one must seek an exemption from the County which grants a Timber Harvest Operation exemption under the Forest Conservation Law.[1]

In order to obtain the necessary permits to conduct the Timber Harvest Operation, Plaintiff avers that he subsequently sought and obtained the services of a consultant who possessed extensive experience in obtaining Timber Harvest Operation permits. On November 7, 2008, the consultant retained by Plaintiff filed an application for an exemption on behalf of the Timber Harvest Operation that Dr. Mess and Plaintiff were seeking to perform. To qualify for a Timber Harvest Exemption under the Forest Conservation Law, the applicant must satisfy three requirements. *See* MONTGOMERY, MD. CODE §22A-5(d)(1)(2004).[2] First, the property under

---

[1] The Forest Conservation Law at issue in this case reads, "Any person who expects to cut, clear, or grade more than 5000 square feet of forest or any champion tree, and who believes that the cutting, clearing, or grading is exempt under Section 22A-5, 22A-6, 22A-7, or 22A-8, must notify the Planning Director in writing before performing any cutting, clearing, or grading and seek confirmation from the Director that the cutting, clearing, or grading is in fact exempt under Article II." Montgomery County Code, §22A-4.

[2] Under 22A-5(d)(1), Exemptions from the Forest Conservation law are available to "a commercial logging and timber operation, including any harvesting conducted under the forest conservation and management program under

review must not be subject to development for five years after the Timber Harvest Operation. *Id.*
Second, the property owner must obtain a sediment control permit from the County. *Id.* Finally, the property owner "must obtain approval from the County Arborist or designee that the logging or timber harvesting plan is not inconsistent with County forest management objectives and is otherwise appropriate." *Id.* Plaintiff contends that the Timber Harvest Operation application submitted on behalf of the Timber Harvest operation that he wished to perform satisfied two of the three requirements.

Plaintiff asserts that the Property Owner (Dr. Mess), at the direction of Plaintiff's consultant, signed a declaration of intent, confirming that the Property Owner did not intend to develop the property for a five year period. Additionally, the Timber Harvest Operation can only be performed after a sediment control permit is issued by the County's Department of Permitting Services ("DPS"). Plaintiff alleges that the Property Owner (Dr. Mess), at the direction of Plaintiff's consultant, signed a sediment control permit application in order to comply with this requirement for the Timber Harvest Exemption. Finally, in order to obtain a Timber Harvest Exemption, the applicant must obtain approval from the County Arborist who certifies "that the logging or timber harvesting plan is not inconsistent with the County's *forest management objectives* and is otherwise appropriate." MONTGOMERY, MD., CODE §22A-5(d) (1) (B) (2004). (emphasis added). This last requirement was not satisfied and thus is a major point of contention in this case.

---

Section 8-211 of the Tax-Property Article of the Maryland Code that: (A) is completed before July 1, 1991, or is completed on or after July 1, 1991, and the property on which the cutting or clearing is conducted is not the subject of an application for development within 5 years after the sediment control permit has been issued; (B) has received approval from the County Arborist or designee that the logging or timber harvesting plan is not inconsistent with County forest management objectives and is otherwise appropriate; and (C) has received a sediment control permit from the Department of Permitting Services and posted the required financial security under Chapter 19.

On December 28, 2008, Defendant Laura Miller (the County Arborist) purportedly rejected Dr. Mess' Timber Harvest Plan "on the grounds that it did not satisfy Defendant County's 'forest management objectives.'" (Doc. No. 46-1, p. 18). The Timber Harvest Plan was again rejected on March 6, 2009. *Id.* at 21. Plaintiff indicates that Miller suggested that the Timber Harvest Plan submitted by Mess be revised to: (1) "[a]djust the spacing of the trees remaining in the woods so that they are evenly distributed . . . .;" (2) "[r]educe the decrease in the percentage of acceptable growing stock by removing more of the deformed and decaying trees . . . .;" and (3) "[l]imit the shift in specifies from yellow-poplar to beech. . . ." *Id.* at 21. Plaintiff states that after the March 6, 2009 denial of the Timber Harvest Plan, he asked his consultant to seek relief from the decision by appealing to Defendant MNCPPC. *Id.* Plaintiff asserts that on May 20, 2009, he and Mess met with Defendant Hoyt, Edwards, and Miller, among others, to review the Timber Harvest Plan that Mess had submitted. During this meeting, Miller supposedly confirmed that Defendant County "had not adopted forest management objectives under which to review the Timber Harvest Plan." *Id.* at 23. At this same meeting, Defendant Edwards and Miller advised Mess that he could perform the harvest without the Timber Harvest Exemption by "seeking approval of a Forest Conservation Plan from Defendant MNCPPC." *Id.* at 24. Dr. Mess apparently did not want to pursue this alternative to seeking a Timber Harvest Exemption.

After the May 20 Meeting, in attempts to comply with the Defendants' suggestions for obtaining a Timber Harvest Exemption under the Forest Conservation Law, Plaintiff avers that he marked trees "(i) to allow for more even distribution of the trees remaining in the woods; (ii) to increase the number of 'deformed and decaying trees' to be removed; and (iii) to change the

ratio of poplar/beech trees from being removed." *Id.* at 25. On August 10, 2009, Defendant Miller and Edwards allegedly met with Plaintiff on the property in question to view the marked trees. Plaintiff states that Miller refused to inspect the newly marked trees and declined to approve the Timber Harvest Plan, requesting more information from the Registered Forester. On August 12, the Forester provided the requested information to Defendant Laura Miller regarding the Timber Harvest Plan that had been submitted by Dr. Mess. In September 2009, Defendant Edwards declined to approve the Timber Harvest Plan.

Consequently, Dr. Mess has failed to obtain an exemption under the Forest Conservation Plan which would allow Plaintiff and Mess to conduct the desired Timber Harvest Operation. According to Plaintiff, Defendant MNCPPC has approved every application for exemption from the Forest Conservation Law since 1992. However, Plaintiff alleges, the application at issue in this case is the first application to be refused approval since 1992.

Contesting the application procedures applied in this case, Plaintiff contends that the County adopted the Forest Conservation Law in 1992 but has "not adopted any 'forest management objectives' under which it reviews a Timber Harvest Plan, nor has it adopted any criteria to determine what is 'otherwise appropriate' with respect to a Timber Harvest Plan [with respect to §22A-5(d) (1)]." *Id.* at 8. Moreover, Plaintiff avers that the Forrest Conservation Law requires that the MNCPPC "adopt regulations, including necessary procedures, to administer [the Forest Conservation Law]." MONTGOMERY, MD., CODE §22A-26(A). Plaintiff believes that the MNCPPC's regulations fail to provide a process for the County Arborist to review the Timber Harvest Plan component of applications submitted for a Timber Harvest Exemption from the Forest Conservation Law.

In their Complaint, Plaintiff states that Defendants informed Dr. Mess of an alternative means of carrying out their Timber Harvesting Operation—obtaining an exemption through the Forest Conservation Plan. Under the "Forest Conservation Plan," property owners whose Timber Harvest Operations fail to obtain an exemption under the Forest Conservation Law can obtain an exemption under the "Forest Conservation Plan" from the Defendant MNCPPC. Under this alternative option, according to Plaintiff, MNCPPC imposes conservation easements over significant portions of the property owner's forest, and these easements benefit MNCPPC. According to the Plaintiff, if the property owner were to obtain an exemption under the "Forest Conservation Plan," MNCPPC would seek the free conveyance of land of any portion of the subject property which was indentified for public acquisition in Maryland's applicable master plan, which in this case is the *Approved and Adopted Olney Master Plan*. The property owner, Dr. Mess, opposed seeking an exemption under the Forest Conservation Plan because he did not want to subdivide his property or subject any portion of his property to public acquisition. Plaintiff alleges that Defendants have repeatedly urged the Property Owner to relinquish his efforts to obtain a Timber Harvest Exemption under the County Defendants' Forest Conservation Law and to alternatively obtain approval for the proposed Timber Harvest Operation under the Forest Conservation Plan. Plaintiff alleges that obtaining an exemption by the latter means would trigger the requirements that the Property Owner convey title and/or conservation easements to the Defendant County and/or MNCPPC, a result which the property owner is seeking to avoid.

In his First Amended Complaint, Plaintiff asserts eleven counts against County and Commission Defendants. In Count I, Plaintiff charges that Defendants have acted in violation

of 42 U.S.C. §1983 by denying him of his constitutional right to equal protection under the law. Count II alleges that Defendants have acted in violation of §1983 by denying him substantive due process. Count III alleges that Plaintiff has been denied procedural due process on the basis of biased decision making in violation of §1983. Count IV alleges that Plaintiff has been denied procedural due process on the basis of a failure to supervise in violation of §1983. In Count V, Plaintiff alleges that Defendants have denied him procedural due process by failing to provide a post-deprivation process, in violation of §1983. In Count VI, Plaintiff alleges that Defendants have engaged in an unconstitutional taking of his property in violation of the Federal Constitution. In Count VII, Plaintiff alleges that Defendants have engaged in an unconstitutional taking in Violation of the Maryland State Constitution. In Counts VIII though XI, Plaintiff alleges multiple common law state tort claims, including common law tortious interference with contractual relations; conspiracy to commit common law tortious interference with contractual relations; common law tortious interference with prospective economic relationships; and conspiracy to commit common law tortious interference with prospective economic relationships.

This case was originally filed in this Court on November 11, 2009. (Doc. No. 1). On December 21, 2009, County Defendants filed a Motion to Dismiss, or in the alternative, a Motion for Summary Judgment. (Doc. No. 17). Commission Defendants filed the same motion on January 22, 2010 (Doc. No. 33). Plaintiff filed a First Amended Complaint on April 21, 2010 (Doc. No. 46-1). The Court bases this decision on Plaintiff's First Amended Complaint.

# I.   STANDARD OF REVIEW

### a.   Leave to Amend Complaint

F.R.C.P.15(a)(2) Rule provides states that with respect to amending pleadings, "[t]he court should freely give leave when justice so requires."  In *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 222 (1962), the Court held,

> In the absence of any apparent or declared reason, such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc., the leave sought to amend a complaint should, as the rules require, be "freely given."

In this case, the Court does not believe that granting the Plaintiff's Motion for Leave to Amend would unduly prejudice the parties or would be futile.  Therefore, the Court will grant Plaintiff's motion for Leave to Amend and base this memorandum opinion on Plaintiff's First Amended Complaint.

### b.   Motion to Dismiss under Federal Rule of Civil Procedure 12 (b) (6)

Defendants have filed a Motion to Dismiss, or in the Alternative, a Motion for Summary Judgment.   The Court will treat both motions as Motions to Dismiss.  The court has reviewed Defendants' Motions to Dismiss, including its attachments, and has determined that it is not necessary to convert Defendants' 12(b)(6) motion to a summary judgment motion.   A Court deciding on a motion to dismiss "'is not limited to the four corners of the complaint' and may also consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned ... without converting the motion into one for summary judgment.'"  *Kawa v. U.S.* , 77 Fed.Cl. 294, 307 (Fed.Cl., 2007) (citing

WRIGHT & MILLER § 1357).

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999). Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). In two recent cases, the United States Supreme Court clarified the standard applicable to Rule 12(b)(6) motions. *See Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Those cases make clear that Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly,* 550 U.S. at 556 n. 3 (2007). That showing must consist of at least "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

In its determination, the Court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir.1999). The Court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir.1989), legal conclusions couched as factual allegations, *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir.1979). In addressing a motion to dismiss, a court should first review a complaint to

determine what pleadings are entitled to the assumption of truth. *See Iqbal,* 129 S.Ct. at 1949-50.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.* at 1949. Indeed, "the Federal Rules do not require courts to credit

a complaint's conclusory statements without reference to its factual context." *Id.* at 1954. "When

there are well-pleaded factual allegations, a court should assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief." *Id.*

## II.    ANALYSIS

Plaintiff alleges various constitutional violations under 42 U.S.C. §1983, including

Defendants' violations of equal protection, substantive and procedural due process, and an

unconstitutional taking of his property without just compensation.  Plaintiff alleges that

Defendants have violated the Maryland Constitution and Declaration of Rights by instituting an

unconstitutional taking of his property without just compensation.   The Court finds that Plaintiff

lacks standing to bring these claims.  The remaining state tort claims for which Plaintiff does

have standing to bring will be discussed later in this opinion.

### a.  Plaintiff's Standing to Bring Counts I-VII

In their motions to dismiss, both County and Commission Defendants argue that Plaintiff

lacks standing to sue in this case. "Standing 'is perhaps the most important of [the jurisdictional]

doctrines . . . .' It is firmly established that '[i]f a party lacks standing, the district court has no

subject matter jurisdiction . . . .'" *Dolls, Inc. v. City of Coralville, Iowa*, 425 F.Supp.2d 958, 970

-71 (S.D. Iowa, 2006) (internal citations omitted).

"Whether a plaintiff has standing to sue 'is the threshold question in every federal case,

determining the power of the court to entertain the suit.'" *McClain v. Am. Econ. Ins. Co.,* 424

F.3d at 731 (quoting *Steger v. Franco, Inc.,* 228 F.3d 889, 892 (8th Cir.2000)).

When evaluating whether a plaintiff has standing to bring a case, the court must determine "whether the litigant is entitled to have the court decide on the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Moreover, "standing must exist at the time suit is filed." *Richmond Med. Ctr. for Women v. Gilmore*, 55 F. Supp. 2d 441, 472 (E.D. Va. 1999) (noting that actions taken after commencement "do not affect the standing inquiry at all because standing is measured at the time the action is filed.").

To establish standing, Plaintiff must show that: (1) they "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there [is] a casual connection between the injury and the conduct complained of"; and (3) "it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (citations and internal quotation marks omitted). "The party invoking federal jurisdiction has the burden of establishing these elements." *Id.* at 561.

**i. Plaintiff has No Standing to Assert a Taking Without Just Compensation under §1983 or the Maryland Constitution**

Plaintiff avers that his property, the "Timber" on the property of Dr. Mess, was taken by the Defendants because of their refusal to grant Plaintiff the Timber Harvest exemption at issue. Plaintiff alleges that Defendants have "improperly used the County's Forest Conversation Law and the Timber Harvest Exemption application process to preclude a timber harvest on the property for the potential future benefit of the public. . . . As a result all Defendants have prevented Plaintiff Daniel Miller from possessing his property (*i.e*., the Timber), and as a result

have taken his property without just compensation in violation of the Fifth Amendment to the Constitution." (Doc. No. 46-1, p.50) Plaintiff makes an identical allegation that Defendants have violated the Maryland Constitution and Declaration of Rights by taking his property without just compensation. *Id.* at 51-52.

The Court finds the analogous case of *Rosenberg v. Tazewell Cnty.*, 882 F.2d 1165 (7th Cir. 1989) instructive on the issue of Plaintiff's standing in this case. In *Tazewell*, the plaintiff entered into a contract to sell land to Kirby-Coffman, Inc. (Kirby). *Id.* at 1166. Consummation of the contract to purchase the land "was subject to several conditions precedent, one of which was the signing of a contract, by Kirby or one of its affiliates, to construct or participate in the construction of a waste to energy facility or other co-generation facility providing steam energy." *Id.* However, before such a contract would be signed, the parties had a mutual understanding that permits to build the facility had to be obtained before any party would fund the project. *Id.* Therefore, Kirby was required to obtain approval from multiple state and local authorities before they could begin building the facility. *Id.* Kirby first petitioned the Illinois Environmental Protection Agency, which granted Kirby approval to build the facility. *Id.* However, permission from the County Board was also required before the facility could be constructed. *Id.* Kirby applied to the County Board for approval of the facility. *Id.* Subsequently, the Board voted to deny Kirby approval to build the proposed facility. *Id.* at 1167. After being denied approval to build the facility, Kirby later informed Rosenberg (the plaintiff), that he could not carry out the contract to purchase Rosenberg's property because he had failed to obtain the necessary approvals to build the waste-to-energy facility on the property. *Id.*

After being notified that Kirby would not be able to carry out the contract, Rosenberg

13

filed a claim in the Federal District Court for the Central District of Illinois, making claims similar to the taking claims made in this case. *Id.* Specifically, in *Tazewell* the plaintiff alleged, "the refusal of Tazewell County Board to approve the siting application of Kirby-Coffman, Inc. had no reasonable basis, was against the manifest weight of the evidence presented to the Board, and was an arbitrary and capricious action that *amounted to a confiscation of the Plaintiff's property in violation of the Fifth and Fourteenth Amendments of the United States Constitution*." *Id.* (emphasis in original). The District Court in *Tazewell* dismissed the plaintiff's complaint, holding that the plaintiff lacked standing because he had not suffered an injury sufficient to confer standing. *Id.* The district court made such a finding because the agreement between Rosenberg and Kirby to purchase the property at issue, "'gave rise only to an expectation, that the agreement would be consummated,' and therefore did not constitute an 'injury in fact . . . . At no point,' the district court pointed out, did Rosenberg 'have any state law interest in the issuance of the permit.'" *Id.* (internal citations omitted).

Tazewell appealed the District Court's holding that he lacked standing, but the Seventh Circuit affirmed the District Court's decision. The Seventh Circuit highlight that in order to have standing, "the Plaintiff need not only have sustained an injury, but an injury *personal* to it." *Id.* at 1168. (emphasis in original). Supporting the District Court's finding that Rosenberg suffered no personal injury, the Court found it persuasive that, like in the case at bar, the County did not reject Plaintiff's application. *Id.* at 1169. The Court stated:

> [T]he County rejected *Kirby's* application, not Rosenberg's [the Plaintiff's]. Under the contractual relationship between them, it is clear that it was Kirby's obligation to attempt to secure the appropriate permits. Indeed, the only expectation that Rosenberg could have under the agreement was that Kirby would purchase the land if its efforts in securing the permits were successful. This expectation hardly transforms Kirby's lack of success into a 'distinct and palpable injury.'" *Id.* (internal citations omitted) (emphasis in

14

original).

The case at bar bears striking similarities to *Tazewell*. In the case at bar, Plaintiff and Dr. Mess, entered into a contract whose consummation was dependent upon obtaining the necessary approvals from the state. In *Tazewell*, like in this case, the Plaintiff himself, did not directly apply for the permit at issue. Instead, the other party to the contract applied for the permit and was denied. Defendants correctly highlight that:

> [A]ll of the relevant applications and filings with the forest conservation authorities were made by the landowner, Dr. Charles Mess. Dr. Mess is the owner of the land from which the trees were removed; Dr. Mess filed the Declaration of Intent; Dr. Mess thus made the certifications necessary to obtain approval for the timber harvest; Dr. Mess sought and obtained the requisite sediment and control permit; and Dr. Mess retained the forestation expert who, on Dr. Mess' behalf sought approval of the timber harvest. The Plaintiff sought no permit and is bound by none of the certifications and representations made by Dr. Mess. The only party who can claim any form of aggrievement is Dr. Mess.

(Doc. No. 17).

In his opposition to Defendants' Motion to Dismiss, Plaintiff does not negate the fact that Dr. Mess filed all of the necessary paperwork for the application at issue. Plaintiff responds to the Defendants' assertion that he has no standing by alleging that Dr. Mess and the Plaintiff comprised an "operation," and the individuals within this operation each acted on behalf of the operation. Specifically, Plaintiff alleges that:

> [W]ho can act on behalf of the "operation" is a function of who constitutes the "operation." In most cases, as in the instant case, the "operation" will consist of the landowner who controls the land and trees, and the commercial logger who has equipment, workforce, licenses, expertise, and access to lumber markets necessary to conduct a successful timber harvest. (Doc. No. 36, p. 6).

In an attempt to demonstrate that Dr. Mess was acting on behalf of the "operation," (an entity which supposedly includes the Plaintiff) when he signed all of the relevant documents for a Timber Harvest Exemption, Plaintiff makes a creative, but unpersuasive argument. Plaintiff

15

declares that Dr. Mess was applying on behalf of the "operation" when he applied for the Timber

Harvest Operation.   Attempting to distinguish the case at bar from *Tazewell*, Plaintiff posits that

the "permit applicant in *Tazewell* did not, as a matter of law, submit the relevant permit

application on behalf of both himself and the Plaintiff." (Doc. No. 36, p. 8).   Plaintiff cites no

case law or other authority for the proposition that "operation" should be construed to include the

people carrying out the operation.   Nor does Plaintiff cite any authority that the Maryland Code

perceived "operation" to have the meaning that Plaintiff gives it.   Even if the Court were to

interpret "operation" in the manner that Plaintiff does in his opposition to Defendants' motions,

from the pleadings, it appears to the Court that Plaintiff's control over the application process

was indirect, at best.[3]

Nothing in the pleadings indicates that Dr. Mess submitted the application at issue on

behalf of the "operation" or the Plaintiff.   Dr. Mess signed the "Forestry Declaration of Intent,"

declaring that the subject property would not be developed for a period of 5 years.   *See* County

Defendant's Exhibit 1.   Dr. Mess did not sign this document on behalf of the "operation," but

solely on behalf of himself.   In fact, Plaintiff's name appeared nowhere on this document.

When completing the "Application for Sediment Control Permit," Dr. Mess did not sign the

application on behalf of the "operation."   *See* County Defendant's Exhibit 2.   Again, on this

document, Dr. Mess signed the application entirely on his own behalf, with Plaintiff's name

appearing nowhere on this document.   Next, in the application for a Forest Conservation

Exemption Review, only Dr. Mess signed the document.   *See* County Defendant's Exhibit 3.

---

[3] In the Complaint, Plaintiff appears to only have played an indirect role in the application for a Timber Harvest exemption.  Plaintiff claims that he hired a consultant  to obtain the permit on behalf of the Timber Harvest Operation.  (First Amended Comp, ¶ 36).  Additionally, Plaintiff avers that the Property Owner (Dr. Mess), at the direction of Plaintiff's consultant signed an application for a sediment control permit. *Id.* at ¶41.  Plaintiff does not allege any direct involvement that he had during the application process for the Timber Harvest exemption.

This application has a line for the applicant to direct the MNCPPC to a contact person other than the applicant.  Dr. Mess did not use Plaintiff's name as the contact person, instead, directing the MNCPPC to another individual.  Furthermore, on this same document, the applicant is asked to give the MNCPPC the name of the plan being submitted.   Dr. Mess named the proposed plan the "Charles F. Mess Timber Harvest P200 ST13," failing to indicate that Plaintiff, Mr. Miller, had any interest in the proposed plan.   In addition to the application documents filed by Dr. Mess, Defendants offer several correspondences that transpired between Dr. Mess and the Defendants.  However, all of these correspondences were directly addressed to Dr. Mess.  The only reference to Plaintiff in any of these documents was in an email to Dr. Mess from Defendant Laura Miller.  In the email, Defendant states:

> Mr. Brumbley's reference to commerce thinning is simply defined by whether the wood that is removed is valuable enough to make a profit.  This is essential in that it makes it worth *Mr. Miller's* time and effort to do the work, and therefore sustainable from an economic point of view.  However, it is irrelevant to the question of sustainability from an ecological point of view.

> Defendant's Exhibit 9.  (emphasis added).

To negate this evidence, in his Complaint, Plaintiff avers that he hired a consultant that assisted in attempting to secure the exemptions at issue.  Plaintiff does not mention his consultant by name.   From the exhibits offered by Defendants, it appears to the Court that neither Plaintiff nor his consultant had any role in applying for the Timber Harvest Exemption.   The exhibits mentioned above demonstrate that only Dr. Mess' name appeared on the relevant application documents.   Moreover, Plaintiff fails to mention his consultant's role in the application in any subsequent pleadings beyond the First Amended Complaint.

In *Tazewell*, when evaluating the Plaintiff's standing to sue, the Court found it persuasive

that the Plaintiff had no apparent involvement in the application process to secure the necessary permits to build the proposed facility.   The Court noted that "Kirby shouldered the complete burden of applying to the various authorities for a siting permit . . . . Kirby suffered from no impediment to the vindication of its own rights, yet it did nothing.  Indeed, after the County Board's decision on reconsideration of the application, Kirby did not seek administrative or state court review, nor did it join in [the] action brought by Rosenberg in the district court."  *Tazewell*, 882 F.2d at 1170.

Like in *Tazewell*, in the case at bar, the pleadings and attachments offered to support them demonstrate that Plaintiff had little to no involvement in the application process for the Timber Harvest Permit. Thus, the Plaintiff has not demonstrated that he has standing to allege that his property has been unlawfully taken by Defendants.  Nonetheless, the fact remains that if an exemption had in fact been granted, because the only name on the application documents was that of Dr. Mess, the exemption would have only belonged to Dr. Mess, not the Plaintiff.

In the case at bar, Dr. Mess has the same legal standing that Kirby would have.  Dr. Mess has not joined in this action, nor is there any claim by Plaintiff that he has sought administrative review of Defendants' actions.   With this in mind, Plaintiff is "simply not in a position to sharpen [ ] the presentation of the issues and provide illumination of difficult constitutional questions." *Id*.  (internal citations omitted).

Although the Plaintiff has not demonstrated that he has suffered "injury in fact," sufficient to meet the requirements for standing under Article III of the Constitution, the Court will briefly address the Plaintiff's potential for standing under a third-party standing theory.   In *Tazewell*, the Seventh Circuit stated:

It is well established that, with regard to a litigant's raising the rights of a third party, federal courts have imposed upon themselves a 'salutary "rule of self-restraint" designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative. Accordingly, federal courts before permitting third party standing, have examined closely the relationship of the litigant and third party to determine whether proceedings conducted by the litigant will fulfill the underlying policy concerns of the standing requirement. The principle concern, of course, if whether the 'applicable constitutional questions have been and continue to be presented vigorously and 'cogently.'"

*Id.* at 1169 (quoting *Craig v. Boren*, 429 U.S. 190, 193 (1976).

In *Tazewell*, the Court did not confer third-party standing on Rosenberg, indicating that they were not convinced that the constitutional questions would continue to be presented cogently and vigorously by Rosenberg. *Id.* Supporting their belief, the Court stated,

"[t]he defendant's action did not deprive Rosenberg of its land or of any potential customer, other than Kirby. Unlike the beer vendor in *Craig*, whose business was substantially impacted by a continuing ban on an entire class of potential patrons, and the book venders in *Virginia v. American Booksellers*, 484 U.S. 383 (1988), whose business was substantially affected by a law designed to restrict juveniles' access to pornography, Rosenberg does not allege that the County Board's decision will have a continuing impact on its ability to sell Rosenberg Industrial Park."

*Id.* at 1170.

The Court went on to explain that Rosenberg should be denied third party standing because of the potential risks related to the actual victim of the alleged harm that exist when third party standing is conferred: "The ability of the actual victim to protect his legal rights may be impaired by the activity of his self-appointed protectors." *Id.*

In the case at bar, there is no indication that the County or the Commission's application procedures for the grant of Timber Harvest Exemptions will place a continuing ban on Plaintiff's ability to obtain Timber Harvest Exemptions in his future business dealings. The pleadings demonstrate that the Defendants did not believe that the application submitted by Dr. Mess was

appropriate for the approval of a Timber Harvest Exemption.  However, it defies logic to believe that every application submitted by Plaintiff, or someone with whom he has contractual privity, will be denied a Timber Harvest Exemption.  Furthermore, if Dr. Mess believes that the process by which his Timber Harvest Exemption was denied was unlawfully instituted, Dr. Mess has the right and ability to file a complaint on his own behalf.  The injury, if any, in this case appears to belong to Dr. Mess, not the Plaintiff.   Therefore for the reasons articulated above, the Plaintiff does not have standing to assert that his property was unconstitutionally taken without just compensation.  Since Plaintiff's state law cause of action alleging an unconstitutional taking under the Maryland Constitution is the state law equivalent of the federal takings claim, the court will dismiss that count on the same grounds**.**

### ii.  Substantive and Procedural Due Process

To sufficiently allege a cause of action for both substantive and procedural due process, Plaintiff must demonstrate that he possessed a protected property interest in the matter at bar. With respect to procedural due process, "procedural due process rights are only violated when a *protected* liberty or property interest is denied without adequate hearing. Thus, in order to succeed on this claim, Plaintiff must show (1) that it was deprived of a protected liberty or property interest, and (2) that such deprivation occurred without the requisite due process of law."  *White Oak Prop. Dev., LLC v. Washington Tp., Ohio*, 606 F.3d 842, 854 (6th Cir. 2010). Likewise, in order for Plaintiff to show that his substantive due process rights were violated, he must sufficiently allege that he has a protected property interest in the matter.  *See id*. at 852-54. (affirming the District Court's decision to dismiss plaintiff's substantive due process claim because plaintiff did not have a protected property interest in the matter).

Based on the discussion above, the Court has determined that the Plaintiff does not have a property interest in this matter. Viewing all factual allegations in the Complaint in the light most favorable to Plaintiff, it is obvious from the pleadings that Plaintiff has not alleged sufficient facts to demonstrate "any state law interest in the issuance of the permit.'" *Id.* at 1167. Like the agreement at issue in *Tazewell*, the agreement to purchase the timber in this case "gave rise only to an expectation that the agreement would be consummated." *Id.* This agreement was contingent upon the favorable exercise of discretion of the Defendants in this case. To assume that Defendants would grant Dr. Mess a Timber Harvest Exemption was a gamble at best, and such an expectation was certainly not a property interest. Even after accepting all factual allegations in the Complaint as true and drawing all reasonable inferences in the Plaintiff's favor, the Court believes that Plaintiff has failed to offer sufficient factual support for the claim that he has property or a property interest in the issuance of the permit at issue. Thus, Plaintiff has not asserted a cognizable claim that his substantive or procedural due process rights have been violated.

### iii. Denial of Equal Protection

For the proceedings reasons, **COUNTS I** though **VII** will be **DENIED** with prejudice.

### IV.    Remaining State Law Claims

The Court has subject matter jurisdiction over the remaining state law claims based on diversity of citizenship between the parties. Plaintiff has standing to bring the various state law claims asserted. As such, the Court will address the remaining state law torts *seriatim*. Plaintiff alleges four additional state law causes of action: (1) common law tortious interference with contractual relations; (2) conspiracy to common law tortious interference with contractual

relations; (3) common law tortious interference with prospective economic relationships; and (4) conspiracy to commit common law tortious interference with prospective economic relationships.

### a. Common Law Tortious Interference with Contractual Relations and Related Conspiracy Claim

In Plaintiff's First Amended Complaint, Plaintiff alleges that Defendants have tortiously interfered with his contractual relations. To support this claim, Plaintiff alleges that County Defendant, acting through its agents Defendant Leggett, Defendant Hoyt, Defendant Edwards, and Defendant Laura Miller had actual knowledge of the Plaintiff's Contract with Dr. Mess. (Doc. No. 46-1, ¶244). Plaintiff additionally alleges that through their employees Defendant Stanley and Defendant Pfefferle, Defendant MNCPPC had actual or constructive knowledge of Miller's Contract with Mess. *Id.* at ¶245. According to Plaintiff, County Defendants intentionally interfered with his contract with Mess by "knowingly making it impossible for the Property Owner [Mess] to perform under the terms of the Contract . . . ." *Id.* at ¶246. They intentionally interfered by denying the Plaintiff a timber harvest exemption on four separate occasions, basing their denials on no legal grounds." *Id.* at ¶247-48. Supporting their claim that Defendants possessed a wrongful motive for denying the exemption for the Timber Harvest, Plaintiff avers that County and Commission Defendants intentionally withheld the exemption for the Timber Harvest because they anticipated acquiring public rights to the property in the future via the Forest Conservation Plan.

As outlined in *Brass Metal Prods., Inc., v. E-J Enters., Inc.*, 189 Md. App. 310, 348 (2009), to establish a claim for the common law tort of interference with a contractual relationship, the Plaintiff must demonstrate following:

"(1)The existence of a contract or legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom."

Discussing the tort of common law interference with a contractual relationship, the Court in *K & K Mgmt. v. Lee,* 316 Md. 137, 155-156 (1989) outlined the following factors that should be evaluated when determining whether the Defendant's actions constitute an improper interference with contractual relations:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties."

Intent alone, however, may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about.

Further explaining the the intentionality aspect of the tort, the Court in *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.* 336 Md. 635, 656, 650 (1994) asserted that:

[A]n act of tortious interference with economic relations is characterized by the defendant's specific purpose to interfere, and that acts which incidentally affect another's business relationships are not a sufficient basis for the tort. In particular, the Court declined to hold that the tort would lie wherever an intentional breach of contract would foreseeably impinge upon a contracting party's economic relations with others. The Court in *Travelers Indemnity v. Merling,* 326 Md. 329, 343, 605 A.2d 83, 90, *cert. denied,* 506 U.S. 975, 113 S.Ct. 465, 121 L.Ed.2d 373 (1992), reiterated that "[f]or one to recover for tortious interference with contractual or economic relations, the interference must have been wrongful or unlawful."

23

For the purposes of this tort, the Court explained that "wrongful or malicious interference with economic relations is interference by conduct which is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships. Wrongful or unlawful acts include common law torts and '*violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law and the institution or threat of groundless civil suits or criminal prosecutions in bad faith*.'" *Alexander*, 336 Md. at 657. (internal citations omitted) (emphasis added).

The *Alexander* court cites *Travelers Indemnity v. Merling*, 326 Md. 329, 343 (1992), for the holding that "an insurance company was not liable for the tort of wrongful or malicious interference when the alleged act of interference constituted the insurer's compliance with a state statute." *Alexander*, 336 Md. at 656.

Having evaluated the pleadings in the case at bar and the Maryland precedents illuminating this tort, the Court does not believe that Plaintiff has adequately alleged that Defendants acted wrongfully or unlawfully in denying the Dr. Mess the Timber Harbor Exemption, despite the fact that this denial may have interfered with Plaintiff's ability to consummate his contract with Dr. Mess. Plaintiff consistently alleges that Defendants, acting without legal authority, have "intentionally" interfered with his contract with Dr. Mess. (First Amd. Complaint, ¶246-247; Doc. No. 36, p.19). In his opposition to Defendants' Motion to Dismiss, Plaintiff avers, "Daniel Miller's Complaint is grounded on the premise that the Commission and County Defendants interfered with the contract precisely because they were not pursuing legitimate goals (i.e., they were trying to prevent the harvesting of any trees before public acquisition of the subject property in the absence of any legal authority whatsoever to do

24

so)." (Doc. No. 36, p. 20).

Plaintiff makes bald allegations not supported by any facts to demonstrate that Defendants acted with the intent of interfering with the existing *contract* that he had with Dr. Mess. Thus Plaintiff has not complied with the pleading standards mandated by *Twombly* and *Iqbal*. In light of the entire pleadings and drawing all reasonable inferences in the Plaintiff's favor , the Plaintiff has not set forth a cognizable claim for tortuous interference with contractual relations.

Applying the principles from the above cited Maryland case law, in order to sufficiently allege that a defendant has tortiously interfered with contractual relations, the Plaintiff must make a factual showing that the defendant acted with the purpose of interfering with the contract at issue. The holding from *Alexander* warrants recitation for the case *sub judice*. "[A]cts which incidentally affect another's business relationships are not a sufficient basis for the tort." *Alexander*, 336 Md. at 270. In this case, it is apparent from the pleadings that the Defendants' acts of denying the exemption to Dr. Mess were not done to interfere with the contractual relationship between Dr. Mess and Plaintiff. Even if the motive in denying the exemption to Dr. Mess was based on having Dr. Mess grant the state of Maryland a conservation easement under the Forest Conservation Plan exemption as Plaintiff alleges, such a motive still does not constitute a motive to interfere with the contractual relationship between Mess and Plaintiff.

Accordingly, unless the State actors act with the express purpose of stymieing the contractual relationship amongst third parties, their act of impeding a contractual relationship can only be considered incidental to their delegated duties of determining when parties have presented a meritorious application for an exemption. After drawing all reasonable inferences

from the pleadings in the Plaintiff's favor, the Court believes that Plaintiff has failed to adequately allege that Defendants intentionally acted to interfere with his contract with Dr. Mess.

Having found that Plaintiff has failed to sufficiently allege that Defendants tortiously interfered with his contractual relations, the Court also finds that Plaintiff has failed to allege a conspiracy to common law tortious interference with contractual relations. In order to establish a valid claim of conspiracy, the Plaintiff must first establish the underlying act of the agreement. ("Under the law of Maryland, a conspiracy is defined as 'a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal.' Conspiracy does not give a right of action unless it leads to wrongful acts or omissions. If an act is lawful, a combination or conspiracy to perform it does not make the act unlawful." *Olivares v. NASA*, 934 F.Supp. 698, 705 (D.Md.,1996) (internal citations omitted)). As discussed above, the Court is not persuaded that the underlying act has been properly alleged by Plaintiff. As such, the Court will **GRANT** the motion to dismiss on the tortious interference with contractual relations claim and the related conspiracy claim.

**b. Common Law Tortious Interference with Prospective Economic Relationships and Related Conspiracy Claim**

Plaintiff's tenth count in his Complaint is for tortious interference with Prospective Economic Relationships. To establish a successful claim under this cause of action, Plaintiff must demonstrate that,

> (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 71, 485 A.2d 663 (1984).

As discussed above, the pleadings failed to make a showing consisting of enough facts to demonstrate that Defendants intentionally interfered with Plaintiff's contract with Dr. Mess. For the related tortious interference with prospective economic relationships claim, Plaintiff must also make a showing of Defendants' intention to damage Plaintiff's commercial relationships. Viewing the pleadings in the light most favorable to the Plaintiff, the Court believes that Plaintiff has failed to set forth sufficient facts in his Complaint showing that Defendants intentionally acted to damage his business relationship with Dr. Mess. As such, Plaintiff has failed to sufficiently allege this cause of action, and the Court will **DISMISS** this claim. Additionally, the court will **DISMISS** Count Ten of Plaintiff's Complaint, the related Conspiracy Commit Tortious Interference with Prospective Economic Relationships claim, as Plaintiff has failed to adequately allege the underlying act in the conspiracy claim.

## CONCLUSION

For the aforementioned reasons, this Court will **GRANT** Defendant's Motion to Dismiss (Doc. Nos. 17 and Doc. Nos. 33) will **DISMISS** this action. An Order consistent with this Opinion will follow.


Date:   September 29, 2010                  _____/s/_____
                                            Alexander Williams, Jr.
                                            United States District Court